*In re* EMMONS.

1. Attorney and Client—Disbarment—Evidence of Misconduct.

In disbarment proceedings against attorney who had handled an estate and testamentary trusts during two successive 8-year periods, where during first period the operations were successful and resulted beneficially to the trust, irregularity of conduct during such period *held*, not basis of affirming an order of disbarment in the case.

2. Trusts—Self-Dealing by Fiduciaries.

One acting in a fiduciary capacity has no right, without an express order of the court, to use the funds which he holds in trust in self-dealings.

3. Attorney and Client—Disbarment—Failure to File Fiduciary Bond—Self-Dealing—Concealment—Evidence.

Under record in disbarment proceedings showing that attorney who, while acting as fiduciary for large estate, failed to give bonds ordered by probate court, that he improperly and wrongfully used trust funds in self-dealings which resulted prejudicially and with loss to the trust estate, and that such self-dealings were intentionally and wrongfully concealed by him from the court, disciplinary order disbarring defendant is affirmed by a court equally divided between disbarment and suspension for three years.

Appeal from Wayne; Bell (Frank A.), Elliott (Philip), and Weimer (George V.), JJ., presiding. Submitted October 15, 1946. (Docket No. 85, Calendar No. 43,465.) Decided April 8, 1947. Rehearing denied May 16, 1947.

Disbarment proceedings against Harold H. Emmons. Order of disbarment entered. Defendant appeals. Affirmed.

*George E. Brand,* for Board of Commissioners of State Bar of Michigan.

*Edward N. Barnard, Lawrence Rothenberg* and *Harold H. Emmons, Jr.,* (*B. D. Chandler, A. W. Sempliner* and *Hugh Francis,* of counsel), for defendant.

NORTH, J. On June 19, 1946, three circuit judges sitting *en banc* in the circuit court of Wayne county, after due hearing, entered an order whereby Harold H. Emmons was disbarred as an attorney-at-law, his license to practice law in this State was revoked, and his name ordered stricken from the roll of attorneys; but with a stay of the order not to exceed 20 days, pending an application for leave to appeal. Leave having first been obtained, Harold H. Emmons, hereinafter referred to as defendant, has appealed from the order of his disbarment.

This disbarment proceeding was instituted and prosecuted under the State Bar rules. After service upon defendant in 1940 of charges preferred, an extended hearing was had before a grievance committee of the third judicial circuit. At the conclusion of the hearing in 1946 the committee filed its report, recommending that defendant be disbarred. In accordance with proper procedure the matter came on for hearing before the three circuit judges and on review of the record made before the grievance committee the result first above noted followed. The appeal now before us is under Supreme Court Rules governing leave to appeal and that portion of Rule No. 15 of the Supreme Court Rules adopted for the State Bar of Michigan, which in part reads:

"Any final order entered (in disbarment proceedings before circuit judges) shall be subject to review by the Supreme Court in its discretion on the law and the facts."

Briefly stated, the charges preferred against the defendant are that while acting in a fiduciary capacity incident to probating the estate of George H. Cummings, deceased, and ultimately, in conducting the affairs of a testamentary trust provided in the Cummings' will, defendant was guilty of misconduct in the following particulars:

(a) Failure to give $120,000 bonds as testamentary trustee as required by court order entered by probate judge Hulbert June 19, 1928, incident to allowing defendant's final account as surviving executor and assigning the residue of the estate to him as surviving testamentary trustee for the benefit of crippled children; concealment of such failure; wrongful assumption of the office of trustee and misrepresentation in procuring an order from a successor judge (Judge Murphy) in 1935 for reduction of the required trustee bonds.

(b) Self-dealing with trust funds and misrepresentation and concealment thereof in accounts filed in 1935 and 1936.

(c) False sworn statements in his answer as a defendant in a chancery accounting proceeding (*King v. Emmons*, 283 Mich. 116 [115 A. L. R. 564]), commenced in 1936, concerning his failure to give the required bonds and defendant's alleged self-dealings.

Understanding of the factual background in consequence of which the order of disbarment was made renders necessary recital of the following. George H. Cummings died testate in June, 1920. By his will the residue of his estate together with accruals and additions thereto were left in trust to the executors named in the will for the purpose of establishing and maintaining a home for the care, maintenance and education of crippled children who otherwise are destitute of the proper and necessary means for their care, medical attention and educa-

tion. The will named as executors testator's sister, Nellie G. Rockafellow, and Harold H. Emmons, and they were so appointed in July, 1920. They filed an account as executors which was allowed in December, 1924. Nellie G. Rockafellow died the following month, and thereafter Harold H. Emmons continued to administer the Cummings estate as the sole surviving executor. For some further details see *King* v. *Emmons, supra.*

The earlier proceedings in the Cummings estate were before Judge Durfee who died in 1927. He was succeeded by Judge Hulbert who resigned April 1, 1934. Judge Hulbert was succeeded by probate judge Thomas C. Murphy. In June, 1928, probate proceedings in the estate of George H. Cummings, deceased, were closed, and on petition of the defendant herein the proceeds of the estate were, by the order of Judge Hulbert, assigned to defendant as sole surviving trustee. In his 1928 petition for closing the estate the defendant herein stated under oath that the assets of the estate were valued at upwards of $1,250,000. In the June, 1928, order of Judge Hulbert it was provided that Emmons should give three bonds. Two of them, each in the sum of $10,000 pertained respectively to two other testamentary trusts under the Cummings will, and a bond in the sum of $100,000 was ordered incident to the administration of the testamentary trust for crippled children. It is admitted that none of the bonds so ordered were given. Nonetheless, the record discloses that the defendant herein took over the assets of the estate and continued to manage its affairs until 1935 without giving any of the ordered bonds. After Thomas C. Murphy became probate judge and on application of defendant herein in 1935 the amount of bonds ordered in 1928

was reduced to $100 each, and furnished by defendant. As above noted, one of the charges preferred against defendant in the instant proceeding is his failure to give bonds as testamentary trustee in accordance with the June, 1928 order of Judge Hulbert, the concealment of such failure, wrongful assumption of the office of trustee and misrepresentation in procuring an order from a successor judge in 1935, whereby the amount of the trustee's bonds was reduced.

There is credible support in the record for defendant's contention and it will be assumed that at the time of George H. Cummings' death his estate was insolvent. This was due to the fact that his possessions mainly consisted of something like 80 equitable interests in real estate practically all of which were heavily encumbered, and on foreclosures the estate would have been liable for deficiencies, and because of the then somewhat depressed real estate market the encumbered equities were not salable, and the income from the estate was not sufficient to meet carrying expenses. However, a few months after the death of Mr. Cummings real estate values in and about Detroit took on a boom aspect. By May, 1924, incident to their return for the purpose of fixing the Federal estate tax, the co-executors under oath reported the net value of the Cummings estate as being $377,954.54. Defendant testified that in the summer of 1920 he discussed the matter of the Cummings estate with probate judge Durfee and that the latter advised defendant to wind up the estate as insolvent. In this connection defendant's testimony in part was:

"I said, 'In this estate there are three pieces out Woodward avenue totalling about 800 acres.' * * * I mean three parcels as we finally segregated them. * * * I said, 'of course, the build-

ing boom in Detroit is here, in full force and effect, and some of these real estate fellows I have talked to have said if we could subdivide those properties and sell them at retail, they can go out and sell them at retail, they can go out and sell them as lots.'

''He (Judge Durfee) says, 'You know you can't do that as an executor.' And I said, 'Sure, I know it. All we can do, as executor, is sell exactly what the dead man owned when he died; file a petition to sell each piece.' * * *

''I said, 'Judge, if we could get them out of this estate somehow or other and subdivide them, and these men could sell them, and I think they can, we might get enough out of this to pay these Negroes off, that have been swindled out of this money (referring to Negroes who prior to the death of George H. Cummings had purchased lots in the proposed Cummingston Park subdivision, which subdivision was not consummated in Cummings' lifetime). * * * I don't know what they can do, but they are getting ready, lawyers are filing appearances, and so on, and we might get enough out to pay them off, maybe we could pay some of the other debts, I don't know.' * * *

''I have had a lot of experience in real estate, I have owned, in whole or in part, probably interests in 30 subdivisions in Detroit, and I know something about it and I have got confidence that these men can sell these things if we can subdivide them. * * * How would it be if I could get some of my law partners or my friends or my relatives to buy these equities at the probate sale, under license, then they will turn them back to me as an individual, because they won't go into this real estate business, they haven't any interest in it. They will turn them back to me and I will group them into these subdivisions and put these fellows to selling them.' ''

In accord with the plan, which in general is indicated by the foregoing testimony, large acreage

which formerly belonged to George H. Cummings was platted and sold through defendant. As a result thereof, and of some other fortunate transactions, as disclosed by defendant's report to the probate court, as of March 31, 1928, the estate had among its assets cash on hand to the amount of $25,368.76 and land contracts receivable to the amount of $936,584.81; and further that the estate had paid all of its indebtedness and expenses of administration.

The principal aspect of the real estate transactions was the subdivision and sale of three parcels of land. One of these, the so-called Stanley farm, was sold for $75,000, and the proceeds of this sale, according to defendant's testimony went into the funds of the Cummings estate. As to the other subdivisions, defendant testified:

"The balance of the money on these three subdivisions that were sold outside in a similar manner were kept in a separate fund, a trustee fund, to handle the business of this enterprise that I was running, and my statement to Judge Durfee was that when I finished with this whole thing, if I was able to save anything out of it at all, I would turn it into the crippled children's fund, wherever that happened to be at the time. * * * This whole arrangement I made with Judge Durfee was that I would go into the real estate business in my own name, and on my own expense and risk. And I told him if I could ever get anything out of it net, I would put it into the crippled children's fund. * * * It couldn't go into the estate. The estate was through with this property when the (probate) sale was made. So this money I had in my hands as trustee as a result of these subdivision operations was held by me with the idea that when we got to where we knew we were out in the clear, whatever

might be left I would turn into this crippled children's fund.''

The defendant further testified he was going to use the fund accumulated in accordance with what the testator wanted him to do—*i.e.*, to aid crippled children; and that as a part of the plan, he, in 1930, caused to be organized the George H. Cummings Corporation, later (1933) changed to the George H. Cummings Foundation, as an agency to carry out the testamentary trust in accordance with the residuary clause of Mr. Cummings' will. Upon being asked: ''Was there  *  *  *  any method by which you could have been compelled to turn over to this Foundation the proceeds of the sale of these lots,'' defendant replied, ''There is no question but what there was.  *  *  *  An action would lie in the circuit court in chancery any time;'' defendant further asserted that this could be done: ''Under the agreement I had with Judge Durfee, that if, ultimately, I realized anything out of those properties, it would go into the crippled children's fund.''

Throughout these proceedings it has been defendant's theory and contention that in handling the subdivided real estate and the money received from sales in the manner herein indicated, he was not acting in a fiduciary capacity as an executor of the estate nor was he acting as a trustee under the testamentary trust. Instead, his claim is that under the arrangement made by him with probate judge Durfee defendant was authorized to acquire, either directly or indirectly, real estate formerly owned by Mr. Cummings and to dispose of it in the same manner that defendant might have handled his own individual property, but with the understanding that the net proceeds were to be accounted for to the proper custodian of the crippled children's fund.

Notwithstanding in some aspects these earlier real estate transactions may have been highly irregular, nonetheless since the outcome was beneficial to the trust estate, it may well be questioned that the fact that defendant took title to the real property, subdivided it and sold a substantial portion, would afford justification for the result reached by the circuit judges; and it is not our understanding that the result reached by the circuit judges was fundamentally based upon the foregoing, but rather upon the aspects of the record about to be considered.

The period of defendant's alleged misconduct charged by the grievance committee relative to his misuse of trust funds was not the early period of the administration of the estate of George H. Cummings, deceased, but instead during the period of 1928 to 1936. The matters hereinbefore noted so far as materially involved in the salvaging of the Cummings estate occurred prior to the closing of the estate of the deceased in June, 1928. That is, the plan of subdividing and platting real estate formerly belonging to Cummings had been accomplished. At that time the assets of the estate amounted to $1,250,000, as stated in defendant's sworn petition for closing the estate of the deceased and the assignment of the assets of the estate to defendant as the surviving trustee named in the will. We note that defendant now claims the amount was grossly overstated in his petition; but the record discloses that the financial status of the estate was such that in March, 1929, defendant, as hereinafter noted, petitioned the probate court for and received authority to make a loan of $60,000 out of estate funds then on hand. Admittedly the Cummings real estate holdings subsequently materially decreased in value, but that is not a basis of defendant's alleged misconduct.

In the main, the gravamen of alleged misconduct of defendant from 1928 to 1936 is the manner in which he took over the large assets of the estate after it had been rehabilitated, and more particularly defendant's alleged wrongful conduct in self-dealing with the funds of the estate. We deem it of little consequence as to the capacity in which defendant was acting during the period just above noted. Under one view it might be said that as a result of defendant's failure to give the bonds ordered by Judge Hulbert in 1928 and by reason of the statutory provision (see 3 Comp. Laws 1929, § 15870 [Stat. Ann. § 27.3049]) title to the property never vested in defendant as trustee and in legal effect he declined to accept the trust. The result might be, as defendant intimated in his fianl account, that he continued throughout to act in his capacity as an executor. Even if defendant during the period above noted believed he was acting under the oral arrangement which he claims was made with Judge Durfee, but of which there is no official court record, still at all times and under all circumstances disclosed by this record defendant in respect of the assets of the Cummings estate unquestionably was acting in a fiduciary capacity. And in that capacity, under the circumstances of this case, defendant had no right, without an express order of the court, to use in self-dealings the funds which he held in trust.

After June, 1928, when Judge Hulbert entered the order purporting to close the estate of George H. Cummings, deceased, and transferring the assets to defendant as the surviving trustee, defendant made no general report to the court concerning the condition of the trust estate until he filed his final account for Judge Murphy's consideration in June, 1935. In no report prior to Judge Murphy's 1935 order closing the estate did defendant reveal to the court in an understandable manner defendant's self-

dealing transactions. They were merely noted as "investments" without revealing from whom purchases of stock were made or to whom payments therefor were made. It was not until some time after the allowance of defendant's final account in August, 1935, that the nature of the questionable investments by defendant came to the attention of probate judge Murphy. He thereupon appointed a guardian *ad litem* for the unascertained beneficiaries of the crippled children's trust. From a report to the court by the guardian *ad litem* made in May, 1936, the probate court for the first time learned that defendant had used trust funds in purchasing for the trust estate from himself or members of his family 34,119 shares of stock and certificates of indebtedness in the Chemical Research Corporation, and like purchases of 7,120 shares of Wolverine Producing & Refining Company, and that these items, constituting a part of the trust estate, had been purchased at an expenditure of upwards of $231,000 of trust funds during the years 1929 to 1932. The probate court attempted to have defendant make a supplemental final account or to reopen his final account but this was blocked by defendant's application to the Supreme Court for a writ of prohibition. An order to show cause in that proceeding was issued. By stipulation hearing was adjourned from time to time and finally the prohibition proceedings were dismissed by stipulation in June, 1942. The dismissal was due to the fact that at approximately the same time the accounting suit pending in the Wayne county circuit court (see *King* v. *Emmons*, 283 Mich. 116) was dismissed in consequence of a proposed settlement submitted by the parties to, and approved by, the circuit court. It appears in the record before us that in the settlement of the accounting suit defendant herein not only turned

over the assets of the trust estate, but he also paid or turned over several thousand dollars of his individual property, and thereupon received a release in full from liability growing out of his relation to, and activities in, the George H. Cummings estate. Incident to the foregoing settlement defendant herein turned over to the trust fund life insurance carried by defendant having a cash surrender value of $31,203. It further appears that in the settlement of the accounting case the Foundation took over from defendant 34,119 shares of Chemical Research stock, some of which had been purchased at $20 per share from defendant or members of his family with trust funds; and that the market value of this stock during the year of the final estate settlement (1935) varied from $2.35 down to $1.65 per share. The record shows that at no time pending negotiations for the settlement of the accounting suit was the Chemical Research stock worth as much as had been paid for it. And further, in connection with the settlement of the accounting case, it may be noted that one of defendant's witnesses in testifying before the grievance committee said: "he (defendant herein) has turned over, as I understand it, practically everything he had in the world to the Cummings estate or to the orthopedic concern (with which the foundation has been merged)." And the member of the grievance committee who dissented from the recommendation of the other five members of the committee, at the conclusion of the hearing said: "Mr. Emmons and his immediate family have given up every asset they have."

Under the record before us it is quite impossible to overlook certain portions of it which, to say the least, quite clearly indicate that even defendant himself did not believe, during the period with which he has been charged with misconduct, that in conse-

quence of his interview with Judge Durfee in 1920, defendant might rightfully deal with the assets of the estate without regard to his duties and obligations as a trustee. For example, in 1929, when defendant was desirous of making the so-called Glancy loan of $60,000 in which loan defendant was interested as one of the borrowers, for the obvious purpose of being authorized to make the loan he filed a petition in the probate court and upon a showing made obtained an order authorizing the loan. In 1931, depression conditions came about in consequence of which defendant deemed it advisable to minimize obligations of purchasers of lots in subdivisions of the Cummings real estate. Instead of doing this by reason of his individual right and authority on which he now relies, he petitioned the probate court for authority, saying in his petition: "If your petitioner were so authorized to take action as circumstances may dictate in each case; such as remitting interest in whole or in part, granting discount of not exceeding 10 per cent. for payments in full," a desirable result would be accomplished. This petition was granted by the probate judge. And again in 1932, a petition of similar purport was filed in the probate court and the order sought granted, permitting petitioner to grant larger concessions to land contract purchasers than was provided in the 1931 order. As bearing upon the capacity in which defendant made these petitions to the probate court, we quote the following from his 1932 verified petition, which in these respects is much like his earlier petition.

"The undersigned, executor and trustee of said estate, hereby presents this petition to the court for instructions:

"1. Under date of July 2, 1931, this court entered an order authorizing petitioner to make settlement

with land contract purchasers upon the terms therein set forth.

"2. A considerable amount of money was realized *for the estate* through following the terms of said order.

"3. However, existing financial conditions have grown worse during the year. ⁎ ⁎ ⁎

"Wherefore your petitioner prays that this court may consider this subject and by its order instruct your petitioner as to the action he may take in the premises."

We do not overlook, but are not impressed by defendant's present contention, that the foregoing applications to the probate court were made in consequence of insistence and pressure brought to bear by attorneys who represented parties who had purchased lots in the subdivisions. No such intimation is made in any of the petitions filed in the probate court for the purpose of obtaining the respective orders. In any event the explanation is not claimed to be applicable to defendant's 1929 petition to make the Glancy loan. It is difficult to conclude that an attorney of the outstanding ability of defendant would deem it necessary to apply to the probate court in such matters as those above noted if he really believed that by reason of an arrangement with Judge Durfee in 1920 and the subsequent probate sales of Cummings real estate he had the authority in handling these real estate transactions and the proceeds therefrom to act wholly apart from the direction or control of the court, or that he then understood and believed, as contended in defendant's brief, "These joint venture contracts (for the development and sale of the subdivisions) were not assets of the estate at all, but belonged to respondent individually." As giving some further light on this phase of the case, it appears from the

record in the suit for an accounting brought by the guardian *ad litem* in 1936, in behalf of the beneficiaries of the crippled children's trust and against the-defendant herein, defendant filed a sworn answer wherein he said:

"He admits that after the allowance of his final account (in June 1928) as executor as aforesaid, he continued the administration of said estate of George H. Cummings, deceased, as the trustee of the trusts created under the last will and testament of George H. Cummings, deceased, and expressly avers that in that connection he at all times held and administered the rest of said trust as such trustee."

In another paragraph of defendant's answer filed in the same suit he, under oath, made the following statement:

"That commencing in the year 1929, this defendant, being in the need of funds to meet his personal obligations and therefore in the need of disposing of securities held by him, and particularly his interest in the Chemical Research Corporation, as aforesaid, determined to sell his interest therein to this estate, which he did over a period from the year 1929 through the year 1931."

While in the portion of defendant's answer just above quoted he also states that the sales made by him to the estate were made at less than the then market value, that alone would not justify the transaction since the stock involved was of a highly speculative value; and his claim in that regard may well be questioned under the record before us. Defendant's sales of Chemical Research Corporation stock belonging to himself or members of his family in 1929, were on the basis of $20 per share; but the market value of this stock in 1929, as listed on the

Toronto Exchange, was a high of $21.50 with a low of $6 per share. And from the same source it appears the market value of this stock in 1931 dropped to a low of $1.50 per share. By August, 1935, defendant had passed over to the estate as a part of its assets 34,119 shares of Chemical Research stock which had theretofore been the property of defendant or members of his family. He likewise sold to the estate 7,120 shares of stock which defendant or members of his family held in the Wolverine Producing & Refining Company. The former stock was carried in defendant's account with the estate at a value of $184,414, and the latter at $10,680.

In defendant's reply brief he refers to his dealing with trust funds in the Chemical Research stock as not being a sale ''but which was in fact merely setting aside the stock for the benefit of a crippled children's fund.'' Such a contention cannot be seriously entertained under this record. Numerous checks were issued against trust funds in payment for Chemical Research stock which theretofore belonged to defendant or members of his family. The record is barren of any testimony tending to show that defendant petitioned the probate court for authorization of such an investment. And in schedules attached to defendant's 1935 final account as ''executor and trustee'' there appears among the assets belonging to the estate the following items ''7,120 Shares. . . .Wolverine Producing & Refining Co. $10,680'' and ''34,119 Shares. . . . Chemical Research $184,414.'' After having procured an order of the probate court approving defendant's final account as ''executor and trustee,'' with the above items included, defendant cannot now

be heard to say he did not sell the stock to the estate.

The record before us is replete with evidence of defendant's self-dealings with the trust funds here involved. Many facts and circumstances, not hereinbefore noted, appear in the record, but reasonable bounds of decision forbid their detailed recital herein, nor is such recital necessary since to do so would not alter final determination. We have not overlooked defendant's testimony that in developing the real estate subdivisions, above noted, he assumed personal liabilities in large amounts; that as to self-dealing transactions he kept in his file collateral security to indemnify the estate against loss; or his contention that lack of revealing details in his reports filed in the probate court was justified by the established practice in Wayne county of receiving in lieu thereof reports of certified accountants as to the accuracy of the account so filed, and that such practice was followed by defendant. We have considered defendant's claim that his failure to give a trustee bond of $100,000, as ordered in 1928 by probate judge Hulbert, was due to the fact that bonding companies were unwilling to give a bond in that amount, and further that the amount of the bond was fixed in anticipation of an early sale of a valuable piece of real estate, but that since the sale did not materialize, the need for giving the ordered bond ceased. However, the petition which led to the order for the $100,000 bond makes no mention of a contemplated sale of real estate; and defendant's explanation hardly applies to his also having been guilty of failure to give either of the two smaller trustee bonds which were also ordered by Judge Hulbert in 1928. We are also mindful of defendant's contention that by the early probate sales of the real estate formerly belonging to

George H. Cummings the title thereto through conveyances from purchasers at the probate sales became vested in defendant and thereupon he became the absolute owner thereof, and further that in other litigated cases involving real estate formerly property of George H. Cummings it was adjudicated in effect that title thereto had been vested in defendant and thereby defendant asserts that issue became *res judicata;* and a like claim that the order of the probate court approving defendant's final account is *res judicata* of the questions therein involved. None of these matters or others not detailed herein are controlling or such as alter ultimate determination; nor had the matter now before the Court or any controlling aspect thereof been adjudicated prior to the hearing in the circuit court.

On the other hand, we have not stressed or been influenced by the disclosure in this record that for his services in the Cummings estate defendant, by probate orders, was rather liberally compensated in the amount of $125,000. The justness of the ordered compensation is not challenged. Likewise we have refrained from reciting the details of the many and devious ways in which defendant has sought to, and has succeeded in, deferring final decision in the proceedings now before us.

Notwithstanding one of the six members of the grievance committee filed a minority report which we have considered, we are in accord with the prevailing conclusion reached by the grievance committee in part contained in the accompanying footnote.* The record in the grievance committee

---

* "FINDINGS—CONCLUSION. The committee finds and concludes * * * (c) that as to the funds disbursed by him (defendant) in the transactions relating to said securities, he was a trustee and fiduciary and in dealing with himself individually and for his family he was in a position where his personal and family interests conflicted with the discharge of his duties and obligations as such trustee and fiduciary; (d) that by reason of such conflict he could not, and

proceedings was painstakingly reviewed by three circuit judges; and the conclusion reached by the committee followed. We fully approve the commendatory statement of one of the circuit judges who in announcing decision in the trial court said:

"I think that the commissioners of the State Bar Association, the grievance committee that was assigned to this matter, its counsel, and especially Mr. Brand have done a hard and difficult job, an exhaustive job and a praiseworthy job. * * * I feel that the majority report of the committee should be confirmed, including the disciplinary order, and that a disciplinary order of disbarment should be entered."

The record before us necessitates concurrence with and affirmance of the holdings of the circuit judges, the gist of which is that throughout his activities in connection with the Cummings estate and the testamentary trust defendant herein was acting as a fiduciary, that he wrongfully failed to give

did not, exercise the proper and required judgment and discretion required of him as trustee and fiduciary with respect to said funds and the trust thereof; (e) that in making said disbursements he was motivated by his personal financial needs and not by the best interests of the trust or of those beneficially interested in the funds so used; (f) that the prices at which he testified said securities were acquired were unwarrantedly high and were not fixed or determined in a manner protective of the trust; (g) that, at least, the Chemical Research stock and certificate of indebtedness, and the Wolverine & Detroit Bankers Company stock, were, under the circumstances, highly speculative, uncertain and improper for investment of the trust funds therein; (h) that the investments made by respondent in or in connection with the stocks and securities owned by him or his family were not made in the exercise of good faith on his part as trustee of the funds disbursed by him; (i) that respondent wilfully sought to and did conceal the making of such investments from Judge Murphy in respondent's 1935 petition for reduction of trustee bonds and in procuring the order therefor, in his 1935 final account and in procuring court approval thereof, and in his 1936 supplemental account; and (j) the estate of George H. Cummings, the trust for crippled children created by his will, and the beneficiaries thereof were seriously damaged by the conduct of respondent pertaining to said securities and the disbursement of the trust funds in connection therewith."

bonds ordered by Judge Hulbert in 1928, that defendant improperly and wrongfully used trust funds in self-dealings; and we find this resulted in prejudice and loss to the trust estate, that such self-dealings were intentionally and wrongfully concealed by defendant from the court having jurisdiction of the matter, and that, notwithstanding defendant's claim of good faith and exercise of his best judgment, under this record a disciplinary order was essential. On this appeal of necessity consideration has been given to the measure of severity of the discipline imposed. The course of misconduct charged against defendant was not inadvertent. Instead it was deliberate and continued over a long course of years. The disciplinary order is not without precedent in this jurisdiction. See *In re Radford,* 168 Mich. 474, and *In re Hartford,* 282 Mich. 124. As was said of the defendant in the *Hartford Case* so it might well be said of defendant in the instant case.

"His actions exhibit a gross disregard of the obligations imposed upon him by virtue of his status as an attorney and officer of the court, and are not compatible with the attitude and sense of moral responsibility which must be possessed by those with whom the administration of justice is entrusted if the respect and dignity of the courts is to be maintained."

We find nothing in this record which would justify us in deviating from the determination of the three judges in the circuit court of Wayne county, disbarring defendant from the practice of law in this jurisdiction. The judgment so entered is affirmed.

Butzel, Sharpe, and Dethmers, JJ., concurred with North, J.

BUSHNELL, J.   Notwithstanding the thorough and painstaking manner in which this matter has been considered, I nevertheless feel that, under the circumstances, disbarment is too harsh.   I would modify the order of the circuit court to provide for a three-year suspension rather than disbarment.

CARR, C. J., and BOYLES, and REID, JJ., concurred with BUSHNELL, J.