## *In re* EMMONS.

1. ATTORNEY AND CLIENT—REINSTATEMENT—FINDING OF COURT—
   FEES AS ATTORNEY AND EXECUTIVE.
   Finding of court comprised of 3 circuit judges in proceeding for
   reinstatement of disbarred attorney that grievance commit-
   tee's statement that petitioner's receipt of $50,000 subsequent
   to disbarment was for legal services claimed to have been
   rendered a client between 1933 and date of disbarment was
   incorrect is not followed under record including undisputed
   testimony that the fee was for professional and business serv-
   ices prior to the disbarment and for executive services rendered
   subsequent thereto, petitioner having continued to serve as
   president of such corporate client.

2. SAME—PRACTICE SINCE DISBARMENT—EVIDENCE.
   Suspicion of court composed of 3 circuit judges that petitioner
   for reinstatement of license to practice as an attorney had
   continued to practice since his disbarment *held,* not supported
   by grievance committee's unequivocal finding that petitioner
   had not practiced except as permitted by order of disbarment.

3. SAME—REINSTATEMENT—CHARACTER—BURDEN OF PROOF—EVI-
   DENCE.
   Trial judges in proceeding for reinstatement of disbarred at-
   torney *held,* to have made an erroneous finding as to petition-
   er's satisfaction of his burden of proof as to present good
   moral character and fitness to practice law in view of the
   finding of the local grievance committee and record amply sup-
   porting such finding.

---

REFERENCES FOR POINTS IN HEADNOTES
[1–5] Generally as to reinstatement of attorneys, see 5 Am Jur, At-
torneys at Law, § 301.
[1–5] Generally as to reinstatement of attorneys, see Reinstatement
of disbarred or suspended attorney. 48 ALR 1236.

4. SAME—GRIEVANCE COMMITTEE RECOMMENDATIONS—EVIDENCE—CIRCUIT JUDGES.

Recommendations of a grievance committee of the State Bar need not necessarily be affirmed by court comprised of 3 circuit judges, where there is an absence of other testimony before such judges.

5. SAME—REINSTATEMENT—REIMBURSEMENT OF STATE BAR FOR EXPENSES.

Petitioner for reinstatement of right to practice law is ordered, upon being granted reinstatement, to pay stated sum as reimbursement of actual and necessary expenses incurred by the State Bar incident to such proceedings pursuant to State Bar rules (State Bar Rules, No 15, § 13 [1947]).

SHARPE, J., dissenting.

Appeal from Wayne; Elliott (Philip), Brown (William B.), and Fox (Raymond W.), JJ., presiding. Submitted October 13, 1950. (Docket No. 59, Calendar No. 44,866.) Decided May 14, 1951.

Petition by Harold H. Emmons, Sr., for reinstatement of license to practice law. Petition denied. Petitioner appeals. Reversed and remanded with instructions.

*Ernest P. LaJoie* (*Lawrence Rothenberg,* of counsel), for petitioner.

*Chris M. Youngjohn* and *Peter P. Gilbert,* for State Bar of Michigan.

REID, C. J. Petitioner appeals from judgment of 3 circuit judges denying his petition for reinstatement authorizing him to practice as an attorney.

The following statement of facts is agreed on as between counsel appearing on this appeal:

On June 19, 1946, 3 circuit judges, convened and sitting in Wayne county (Judge Philip Elliott writing the opinion) entered an order of disbarment

against petitioner, such proceeding being based upon a report of 5 members of grievance committee No 6 of the State Bar of Michigan, third judicial circuit, one member, however, Hon. Theodore Levin (now United States district judge for the eastern district of Michigan) having filed a written minority opinion and dissent from such report.

This Court subsequently affirmed said decision in *In re Emmons,* 316 Mich 674, 4 justices, BOYLES, BUSHNELL, CARR and REID, holding that 3-years' suspension was adequate.

On October 18, 1949, the instant petition for reinstatement was filed in the Wayne circuit court (same having been on October 6, 1949, initially filed in this Court, but subsequently withdrawn and filed in the circuit court at the suggestion of representatives of the State Bar of Michigan), and it was referred for hearing to the same grievance committee No 6. News items concerning the filing of such petition were carried in the 3 Detroit newspapers on October 6 and 7, 1949.

The grievance committee held its first meeting on November 14, 1949, and it was declared by Chairman Smitt to be a public hearing. Three witnesses testified, a notice of the petition for publication in the Michigan State Bar Journal was called to the attention of the meeting and adjournment was taken until January 16, 1950. Additional newspaper publicity concerning this hearing appeared in the Detroit Free Press on November 15, 1949. The notice, above mentioned, was published in the issue of the Michigan State Bar Journal of December, 1949, at page 34.

The committee reconvened on January 16, 1950 and 4 additional witnesses testified. Documents were presented by petitioner's attorneys as requested, and the meeting adjourned to February 4, 1950, to enable the attorneys for the commissioners

of the State Bar and also for the grievance committee to examine certain records of petitioner and of the probate court.

The committee reconvened on February 4, 1950 and heard 1 additional witness. Said attorneys for the bar and for the committee reported on the examination of said records and documents, and the hearing was declared concluded. Thereafter, under date of March 7, 1950, the committee filed under the verified certificate of its chairman, Max Smitt, its unanimous report containing its findings of fact and recommendations for petitioner's reinstatement.

No person either appeared in opposition or made or filed any objection to petitioner's reinstatement.

On March 7, 1950, Chris M. Youngjohn, chairman of counsel for the commissioners of the State Bar of Michigan for the third judicial circuit, referred said verified report including the findings of fact and recommendations of said committee, to the commissioners of the State Bar of Michigan for the third judicial circuit. On March 21, 1950, Ernest C. Wunsch, secretary of grievances of the third judicial circuit, executed and delivered his certificate that "the foregoing findings of fact and recommendations were inspected at a meeting of the board of commissioners of the State Bar of Michigan for the third judicial circuit, held at Detroit, Michigan, on the 16th day of March, A.D. 1950." No changes were made, nor recommendation for the taking of further testimony.

The 8 members of grievance committee No 6 who attended the hearings and signed the report were:

Max Smitt, chairman,

Emil W. Colombo, of Colombo, Colombo & Colombo,

Louis F. Dahling, of Bodman, Longley, Bogle, Armstrong & Dahling,

William B. Giles, of Lawson & Giles,

Augustus C. Ledyard, of Dickinson, Wright, Davis, McKean & Cudlip,

Ralph A. Mayer, of 2080 Penobscot Building,

Peter J. Monaghan, Jr., of Monaghan, Hart & Crawmer,

John C. Spaulding, of Miller, Canfield, Paddock & Stone.

(Messrs. Smitt, Colombo and Spaulding acted as members of grievance committee No 6 in 1946, which had recommended disbarment.)

Attorneys for the commissioners of the State Bar and for grievance committee No 6 were:

Chris M. Youngjohn, chairman of counsel for board of commissioners for the third judicial district, of Butzel, Levin, Winston, Youngjohn & Quint,

Peter P. Gilbert, of Freud, Markus, Gilbert & Lubbers,

Hugh K. Davidson, of Davidson & Theut,

Henry E. McCurry.

Commissioners of the State Bar of Michigan for the third judicial district were:

William Coit Allee,

Glenn M. Coulter,

Lester P. Dodd, of Crawford, Sweeney & Dodd,

Waldo C. Granse, of Schmalzriedt, Frye, Granse & Frye,

Hazen E. Kunz, assistant friend of the court for Wayne county,

Henry S. Sweeney,

Ernest C. Wunsch, secretary of grievances.

The character witnesses sworn at the committee's hearings were:

Rev. Frank Fitt, pastor of Grosse Pointe Memorial Church,

John Endicott, formerly secretary-treasurer and general manager of Newcomb-Endicott Company,

Donald F. Valley, vice-president of National Bank of Detroit,

Thomas Hollowell, attorney,

Thomas G. Long, of Butzel, Eaman, Long, Gust & Kennedy,

Frank A. Kennedy, attorney and president of Abstract & Title Guaranty Company.

The report of the committee was then filed with the county clerk on April 3, 1950, and was publicized in the Detroit newspapers of April 3 and 4, 1950, together with the statement that the report would be heard by 3 judges on April 24, 1950, and was also publicized in the Detroit Legal Record of April 13, 1950.

All of the foregoing proceedings were thereafter referred to a 3-judge court comprising Hon. Philip Elliott of Flint, Hon. William B. Brown of Grand Rapids, and Hon. Raymond W. Fox of Kalamazoo. This court met in Detroit April 24, 1950 and after a short colloquy Judge Elliott announced that the matter would be taken under advisement. The court reconvened on May 19, 1950, and announced its decision, overruling the report and recommendations of the committee and denying the petition for reinstatement.

Thereafter, on May 24th, a petition for rehearing and for entry of an order approving the report, findings and recommendations of the committee, under Rule No 15, § 13 (1947) of the Supreme Court rules adopted for the State Bar of Michigan, was filed on behalf of petitioner. On June 9, 1950, the court reconvened, denied the motion and entered its order denying the prayer for reinstatement.

The facts concerning the evidence presented to the grievance committee are agreed on as follows:

Petitioner was examined at great length by his own counsel and was likewise cross-examined by the attorney for the bar commissioners and the committee, and by individual members of the committee. In its condensed form, his testimony comprises 69 pages of the printed record.

He testified in minute detail concerning his activities during the 3 years since disbarment, and also

that he had not practiced law nor held himself out as an attorney-at-law, and the other witnesses confirmed, and the grievance committee so found. He produced transcript of his records showing all of his receipts and disbursements during that period, and was carefully examined as to each one. He also produced his income-tax returns for 1947, 1948 and 1949; the leases of his office space; correspondence as to certain items of his receipts; and every record or document requested by the committee or by its counsel. He and his counsel repeatedly proffered to the committee anything which should be asked for, and repeatedly invited the committee, its members and its counsel to visit his office and examine any records, documents or minutes which they desired. Attorneys Davidson and McCurry of the committee's legal staff accepted such invitation and reported to attorney Peter P. Gilbert. Attorney Gilbert examined the files and records of the Wayne probate court as to the 3 estates as to which petitioner testified that he had acted as fiduciary, and reported to the committee thereon, and presented the files to the committee for their examination if desired. Their investigation was exhaustive.

Rev. Frank Fitt, pastor of the Grosse Pointe Memorial Church, testified as to petitioner's church activities and as to his good moral character as known to himself and to the members of the parish.

John Endicott, for upwards of 30 years secretary, treasurer and general manager of Newcomb-Endicott Company, and a man of great and varied experience in business, and with extensive experience with attorneys, testified that he had known petitioner for a great many years, and that for the last 12 to 15 years as the director, secretary, treasurer and member of the executive committee of Indialantic, Inc., he had been closely associated with petitioner, who was director and president of said company; that peti-

tioner had handled the entire business of the company with the knowledge and advice of the witness; that the persons interested in the capital stock and financial status of the company had been mostly residents of Detroit and vicinity, of prominence and financial standing; that none of them had suggested that petitioner should cease his official status with the company on account of his disbarment, but that he had continued to act until August 21, 1948, when he negotiated the disposal of. the company's property for. $143,480, payable 20 per cent. in cash and the balance in 4 equal annual instalments, with interest at 5 per cent., secured by a mortgage on all of the property of the company, which netted each minority stockholder $200 for each share par value $100, and also paid petitioner the balance due him for services, managerial and presidential, to date, and also legal, prior to disbarment. Mr. Endicott further testified that he, petitioner, and Harold H. Emmons, Jr., were constituted a committee (trustees) to collect and disburse the payments of principal and interest as received, and that 2 such payments of principal had already been so handled, and that petitioner had not done any legal work for the company since 1946. (It appears elsewhere in the record that the company's property comprises over 1,100 lots, a 30-acre golf course, a hotel, a casino, swimming pool and bath house, 12 to 15 houses, et cetera.)

Donald F. Valley, certified public accountant, and also vice-president of the National Bank of Detroit since its organization in 1933, testified that he had known petitioner for the past 5 years in connection with Black River Ranch, a Michigan nonprofit membership corporation, of which witness is a member, director and vice-president, and of which petitioner is a member, secretary and treasurer; that the books of the company are kept in petitioner's office where collections are made and periodical statements are is-

sued; that since disbarment there has been no movement to remove petitioner from that position, but that he enjoyed the trust and confidence of all of the members. (Elsewhere in the record it appears that the Black River Ranch property comprises 10,-000 to 12,000 acres of land in Montmorency and Cheboygan counties; that there are 30 members of prominence and standing, comprising businessmen, engineers, lawyers and doctors located in Monroe, Eaton Rapids, Port Huron, Detroit and vicinity; and that $13,000 to $20,000 per year are collected [for the company] and disbursed through petitioner's office.)

Thomas G. Long testified that he had known petitioner for the last 48 years and that the latter is qualified to be reinstated as an attorney. (Elsewhere in the record it appears that Mr. Long represented petitioner and A. W. Sempliner, now deceased, represented Mr. Endicott and Indialantic, Inc., in a litigation brought in 1946 by E. L. Ecclestone, and determined against Ecclestone in this Court in *Ecclestone* v. *Indialantic, Inc.*, 319 Mich 248, and 319 Mich 521.)

Thomas A. Hollowell, attorney since 1940, testified that he had been connected with the receivership of the old Detroit National Bank and with the First Liquidating Corporation since 1942, and now is associated with Mr. Bratton; that he had met petitioner, who was administrator of the Anderson estate, and that upon presentation of the proper papers witness had paid petitioner in such capacity approximately $41,000, the same being refunds in assessments paid by Anderson or his estate on bank stocks; that petitioner had not acted as an attorney.

Frank A. Kennedy, attorney and president of Abstract & Title Guaranty Company, testified that he had known petitioner for upwards of 20 years; that witness and his company have done business with

petitioner during the last 3 years relating to titles and real estate matters; that petitioner had a charge account with the company, and that petitioner has not acted in connection therewith as an attorney.

Petitioner's son, Harold H. Emmons, Jr., testified fully as to petitioner's activities during said 3-year period.

Each of these 6 witnesses, 5 of whom had transacted business with petitioner during the past 3 years, aggregating upwards of $200,000, testified that in his judgment petitioner is possessed at the present time of all of the qualifications requisite, and that he is entitled to be reinstated as an attorney.

Notwithstanding the publicity given to the public during the period from October, 1949, to April, 1950, in the newspapers, and also to the 6,000 members of the Bar throughout the State in the December issue of the Michigan State Bar Journal, not a single person, either before the committee or before the 3 judges, in any manner voiced any objections to petitioner's reinstatement.

The State Bar grievance committee found and unanimously recommended as follows:

"On June 19, 1946, an order was entered in the circuit court for the county of Wayne (miscellaneous file 72,042) whereby the petitioner was disbarred from the further practice of law.

"2. On April 8, 1947, an order was entered by the Supreme Court of Michigan affirming said order of disbarment.

"3. The nature of the charges and the reasons for the entry of the order are set forth in the opinion of the Court, reported [*In re Emmons*] in 316 Mich 674.

"4. The petitioner testified fully as to his activities and occupations since the order of disbarment and the sources of his income during that time.

"5. The petitioner, since his disbarment, has not engaged in the practice or represented himself as an

attorney at law, with the exception of the closing of 4 matters pending at the time of his disbarment, for which permission was given by the Supreme Court in an order entered September 12, 1946. His work in this matter ended on or before May 16, 1947.

"6. His principal occupations have been of an executive and fiduciary nature. In some instances he has served as executor or administrator of estates under appointment of the probate court. He has conducted some business and investment operations for others and some real estate, investment and building business for himself and his family.

"7. The principal items of business were:

"(1) The liquidation of the Indialantic Company, which owned extensive properties in Florida. The earlier history of this company is related in *Long* v. *Earle,* 277 Mich 505, a suit brought by the petitioner as attorney for stockholders and decided in 1936. He performed very extensive services in the disposition of the property and the distribution of the proceeds among the stockholders, amounting to $144,000.

"(2) Management of Black River Ranch, a membership corporation owning a large tract of land in Montmorency and Cheboygan counties. He is secretary-treasurer of the corporation, collects dues and assessments and pays all expenses of operation, running from $13,000 to $20,000 a year.

"(3) Liquidation of the Anderson Subdivision Corporation, a corporation formed for the management of properties forming a part of the estate of the [late?] William K. Anderson. For this corporation he has had principal charge of the sales of property and the distribution to the stockholders of $44,500.

"8. His income has been derived chiefly from these enterprises and smaller ones of similar nature, together with the deferred receipt of attorney fees for services performed before his disbarment. There is no evidence of any income from legal services per-

formed since that time, other than those specifically authorized by the Supreme Court.

"9. During that time he has occupied offices adjoining those of his son, who is a practicing attorney. The 2 offices have a common entrance, but are separated from each other by a corridor. Petitioner's name appears on the door but with no indication that he is a lawyer, and there is no evidence that he has taken any part in the practice of law, with his son or otherwise.

"10. He is now 74 years old and has practiced law for nearly 50 years. He has never had any other occupation, up to the time of his disbarment, except for a short period as an executive of an automobile manufacturing company and service in the army during the first world war, and for such business interests as have been incidental to the practice of law.

"11. Persons of high standing in the community appeared as character witnesses for him, and testified to his excellent character and reputation. Several of these witnesses have been beneficiaries of the trusts, official or unofficial, administered by him. All these approved his retention in his trust capacity and expressed satisfaction with the faithfulness and efficiency of his service.

"12. These character witnesses are the following:

"Rev. Frank Fitt, pastor of the Grosse Pointe Memorial Church, of which he is a member.

"John Endicott, former general manager of the Newcomb-Endicott Company, and a stockholder in the Indialantic Company.

"Donald F. Valley, vice-president of the National Bank of Detroit, and a member of the Black River Ranch.

"Thomas G. Long, attorney at law.

"Frank I. Kennedy, president of the Abstract & Title Guaranty Company.

"13. No person appeared, either in person or by mail, to oppose his reinstatement or to give evidence of any misconduct or defect of moral character or of any attempt to practice law during the period of his

disbarment. From a reading of the transcript it is evident that counsel for the State Bar of Michigan made an extensive and exhaustive investigation so as to present any evidence obtainable which would assist the committee in making its determination and was unable to present evidence to contradict that produced by the petition [petitioner?], and counsel should be commended for their diligent effort.

"14. Four of the justices of the Supreme Court, though concurring in the decision of the Court otherwise, recorded their opinion that a suspension for 3 years would be sufficient.

### "*Conclusions*

"1. The sufficiency of the grounds for disbarment, his guilt or innocence of the charges, and the propriety of the sentence are not now in issue, being *res judicata* by the decision of the Supreme Court.

"2. It is not necessary that the full sentence of the court be carried out. The court rules permit an application for reinstatement, and in the decision on that application, proof of present good moral character is the principal issue.

"3. The petitioner has testified fully to his course of life and occupation, has submitted his books and income-tax returns for examination and has presented adequate character witnesses. There is no evidence to the contrary, and the committee concludes that he had not practiced law since his disbarment and that his present conduct and character * * * [is] such that he is morally qualified to be entrusted with the right to practice law.

### "*Recommendation*

"The committee therefore recommends that the petition be granted and that the petitioner be rein-

stated as an attorney at law, entitled to practice law in the State of Michigan.

> "Respectfully submitted,
>
> "Grievance committee No 6 of the State Bar of Michigan for the third judicial circuit
>
> "By: (signed) MAX SMITT,
>
> "Chairman.

"Dated: March 7, 1950."

Rule No 15, § 13 (1947) of the Supreme Court rules adopted for the State Bar of Michigan among other things provides:

> "Unless cause is shown to the contrary, the report shall be confirmed and an appropriate order shall be entered, which order may include such provision for reimbursement of the actual and necessary expenses incurred by the State Bar in connection with said proceedings, as the court shall deem just. Any final order entered shall be subject to review by the Supreme Court, in its discretion, upon the law and the facts. The provisions of the Michigan court rules pertaining to appeals shall apply to such review and leave to appeal shall be required."

The opinion of Judge Elliott (concurred in by Judges Brown and Fox) overruling the report of the grievance committee and denying the petition for reinstatement, among other things recites:

> "One of the findings of fact is obviously incorrect. In paragraph 7, subdivision 1, referring to the Indialantic Company, the report says, 'He performed very extensive services in the disposition of the property and the distribution of the proceeds among the stockholders amounting to $144,000.' The evidence discloses that $50,000 included in the $144,000 was not distributed among stockholders, but was an attorney fee for Mr. Emmons, which he claimed was due him for legal services between 1933 and the date of his disbarment."

However, it should be noted that the $50,000 item was not simply and solely "an attorney fee." Partly to a different effect and by undisputed testimony it is shown to have been for professional *and business* services prior to the disbarment and for *executive services rendered subsequent thereto,* and was for services over a 15-year period. The amount, $50,000, was fixed by resolution of directors, June 8, 1948, "for his [petitioner's] services since the organization of this company, both legal, presidential and managerial." This was approved by unanimous vote of stockholders, July 12, 1948.

The trial judges, as reflected in the opinion of Judge Elliott, indicated a suspicion that petitioner has practiced since his disbarment. If any suspicions existed in the minds of the members of the Bar grievance committee No 6 for the third judicial circuit as to whether petitioner had actually practiced law since his disbarment, such members were well situated to evaluate and to pursue suspicions to discovery of actual facts. The committee's finding is unequivocal that petitioner has not practiced law since his disbarment, except as permitted.

We must not overlook the nature of petitioner's offense as recited in our opinion in *In re Emmons,* 316 Mich 674. Neither should we overlook the high character and reputation of the bar committee and officers who conducted the hearing and made the report and recommendation. Several highly credible and well-informed witnesses set forth in their testimony in many pages of the condensed record numerous transactions clearly indicating petitioner's consistent integrity and honesty since his disbarment.

Judge Elliott's opinion states:

"We have read the testimony of the character witnesses and cannot find that the petitioner has sus-

tained his affirmative burden to prove present good moral character and fitness to practice law."

This conclusion we deem erroneous. The report of the committee gives ample recitals as to present good character and fitness of petitioner. We consider the record abundantly establishes petitioner's present good moral character and fitness to practice law. In view of uncontradicted testimony which so strongly supported the findings and recommendation of the bar committee, the trial judges were in error in rejecting the committee's recommendation.

I also desire to note that I concur with Mr. Justice SHARPE, who has also written in this case, in that part of his opinion wherein he says he is "not in accord with the petitioner's theory that the recommendations of the grievance committee in the absence of other testimony should be affirmed by the 3 judges." We simply consider the 3 judges came to the wrong conclusion.

The order entered in the trial court is vacated and an order in accordance with this opinion will be entered in this Court, authorizing petitioner again to engage in general practice of law and requiring the payment, under Rule No 15, § 13 of the State Bar rules (hereinbefore quoted in part), by petitioner of $183.75 as reimbursement of the actual and necessary expenses incurred by the State Bar.

BOYLES, NORTH, DETHMERS, CARR, and BUSHNELL, JJ., concurred with REID, C. J. BUTZEL, J., concurred in the result.

SHARPE, J. (dissenting). On June 19, 1946, petitioner Harold H. Emmons was disbarred from the practice of law under the procedure provided in Rule No 15 of the Supreme Court Rules adopted for the State Bar of Michigan. The order for disbarment

was affirmed by the Supreme Court in *Re Emmons,* 316 Mich 674. The facts leading up to and causes for disbarment are to be found in the above case. Petitioner now seeks reinstatement and has filed a petition for that purpose with the clerk of the circuit court of Wayne county. The petition was referred to a grievance committee. The committee conducted a hearing and filed its report recommending reinstatement. Subsequently, this report was referred to Judges Elliott, Fox and Brown who considered the report and recommendations and denied petitioner's prayer for reinstatment. Petitioner appeals.

The testimony taken before the grievance committee and upon which it based its report is thoroughly reported in Mr. Justice Reid's opinion and will not be repeated.

Petitioner urges that under Rule No 15, § 13 of the Supreme Court Rules for the State Bar of Michigan, the 3 judges erred in overruling the unanimous findings of fact and recommendations of the grievance committee. I am not in accord with petitioner's theory that the recommendations of the grievance committee in the absence of other testimony should be affirmed by the 3 judges. The recommendations of the grievance committee are only advisory and not binding upon the court as the court has inherent power to entertain and pass upon petitions for reinstatement and in its discretion may grant or deny the same. See *In re Salsbury,* 217 Mich 260; *Matter of John A. King,* 54 Ohio St 415 (43 NE 686); *Petition of Gaffney,* 28 Cal2d 761 (171 P2d 873).

Of material importance is the determination of what evidence the 3 judges, in addition to the report of the grievance committee, may consider in granting or denying reinstatement.

The 3 judges stated:

"We find that his present moral character and fit-

ness to practice law cannot properly be determined without giving great consideration to conduct so described by the Supreme Court and the former grievance committee.

"We find also that we should consider the long litigation that Mr. Emmons made necessary before a settlement partially reimbursing the trust funds was effected, and should also consider that the present petitioner, by injunctive proceedings in Ingham county and later in the Federal courts, held up for years the proceedings for disbarment."

I concur in the views as above expressed. It follows that the 3 judges had a right to and did consider what we said in *Re Emmons, supra,* 684, 685, 691, 692:

"It was not until some time after the allowance of defendant's final account in August, 1935, that the nature of the questionable investments by defendant came to the attention of Probate Judge Murphy. He thereupon appointed a guardian *ad litem* for the unascertained beneficiaries of the crippled children's trust. From a report to the court by the guardian *ad litem* made in May, 1936, the probate court for the first time learned that defendant had used trust funds in purchasing for the trust estate from himself or members of his family 34,119 shares of stock and certificates of indebtedness in the Chemical Research Corporation, and like purchases of 7,120 shares of Wolverine Producing & Refining Company, and that these items, constituting a part of the trust estate, had been purchased at an expenditure of upwards of $231,000 of trust funds during the years 1929 to 1932. * * * It further appears that in the settlement of the accounting case the Foundation took over from defendant 34,119 shares of Chemical Research stock some of which had been purchased at $20 per share from defendant or members of his family with trust funds; and that the market value of this stock during the year of the final estate settlement (1935) varied from $2.35 down to $1.65 per share. The record

shows that at no time pending negotiations for the settlement of the accounting suit was the Chemical Research stock worth as must as had been paid for it. * * *

"On the other hand, we have not stressed or been influenced by the disclosure in this record that for his services in the Cummings estate defendant, by probate orders, was rather liberally compensated in the amount of $125,000. The justness of the ordered compensation is not challenged. Likewise we have refrained from reciting the details of the many devious ways in which defendant has sought to, and has succeeded in, deferring final decision in the proceedings now before us. * * *

"The record before us necessitates concurrence with and affirmance of the holdings of the circuit judges, the gist of which is that throughout his activities in connection with the Cummings estate and the testamentary trust defendant herein was acting as a fiduciary, that he wrongfully failed to give bonds ordered by Judge Hulbert in 1928, that defendant improperly and wrongfully used trust funds in self-dealings; and we find this resulted in prejudice and loss to the trust estate, that such self-dealings were intentionally and wrongfully concealed by defendant from the court having jurisdiction of the matter, and that, notwithstanding defendant's claim of good faith and exercise of his best judgment, under this record a disciplinary order was essential."

The judges also had a right to consider that the purposes of the Foundation "for the care, maintenance and education of crippled children, who otherwise are destitute of the proper and necessary means for their care, medical attendance and education" were voided and that through the machination of petitioner these children were deprived of the benevolence of the Foundation for a long time.

Our Court, among others, has given expression to the tests to be applied to one who petitions for reinstatement.

*In re Salsbury, supra,* we said:

"The right of the court disbarring an attorney to reinstate him is inherent in such court and has long been exercised. To reinstate a disbarred attorney means to again invest him with the right to practice.
\* \* \*

"This is a proceeding upon a showing that, since such disbarment, the petitioner has by a life of rectitude demonstrated that he is possessed of moral character sufficient to again be a member of the bar. The right to reinstate being inherent in the court we think the practice is well stated in the *Matter of John A. King,* 54 Ohio St 415 (43 NE 686):

" 'When a member of the bar of the State has been, upon proper proceedings, disbarred, and the judgment remains in full force and unreversed, the only remedy of the party is, at the proper time and on a proper showing, to apply to the court in which he was disbarred to be reinstated.

" 'The court rendering the judgment of disbarment, retains a continuing jurisdiction over the subject, as in many similar cases; and may, *upon a proper showing of reformation of the party, or other satisfactory reasons,* arising after the disbarment, reinstate him in the practice of his profession. Readmission, as upon application and examination in the first instance, is not the proper course.' " (Italics supplied.)

In *Beeks v. State Bar of California,* 35 Cal2d 268 (217 P2d 409), the court said:

"In *McArthur v. State Bar* (1946), 28 Cal2d 779, 788 (172 P2d 55, 60), we reaffirmed the principal that 'Upon an application by a disbarred attorney for reinstatement, the object of the court, as observed in *Kepler v. State Bar,* 216 Cal 52, 55 (13 P2d 509, 510) "is to determine whether or not the character of the applicant is such that he should be admitted to an office of trust, and recommended to the public as a trustworthy person, fit to be consulted by others in

matters of confidence. (Citations.) In such proceeding the burden of proof is upon the one who seeks, after disbarment, to accomplish a restoration to the ranks of the legal profession, and, before the court may grant the petition for reinstatement, it must be satisfied and fully convinced by positive evidence that the effort he has made toward rehabilitation of his character has been successful. (Citations.) It is only reasonable that the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. * * * The proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character." ' "

*In re Stump,* 272 Ky 593, 598 (114 SW2d 1094), the court said:

"The fundamental consideration is the nature and degree of misconduct for which the attorney was disbarred and circumstances attending the offense. In sequence are his conception of the serious nature of his act and his previous and, what is of more importance, his subsequent conduct and attitude toward the courts and the practice. This involves the element of time since disbarment as constituting his testing period, for character is not developed or reconstructed in a day. * * * By his subsequent life and conduct he must have demonstrated his reformation. * * * The ultimate and decisive question is always whether the applicant is now of good moral character and is a fit and proper person to be reintrusted with the confidences and privileges of an attorney at law. * * * Therefore, one proven to have violated those conditions of good behavior and professional integrity annexed to the granting of the privilege of practicing law, in applying for restoration, has the burden of overcoming by persuasive evidence the former adverse judgment on his qualification. In short, if the disbarred attorney can prove after the expiration

of a reasonable length of time that he appreciates the significance of his derelictions; has lived a consistent life of probity and integrity, and shows that he possesses that good character necessary to guarantee uprightness and honor in his professional dealings and the faithful discharge of his duties as a lawyer, and therefore is worthy to be restored, the court will so order.   *   *   *

"We appraise the evidence in the light of the foregoing observations and under the control of that attitude."

See, also, *In re Nolan's Petition for Reinstatement,* 310 Mich 204.

In the *Salsbury Case, supra,* the proceedings for reinstatement were before this Court by virtue of the inherent powers of this Court in such proceedings, but the showing necessary for reinstatement is the same regardless of whether such proceedings are by virtue of the inherent powers of the court or under Rule No 15, § 13 of the Supreme Court Rules for the State Bar of Michigan.

Mention has been made of the character of the witnesses produced by petitioner as well as the fact that their testimony was uncontradicted. Such evidence should be considered by the 3 judges as well as by the Supreme Court in taking into consideration whether petitioner is a proper person to be invested with the privileges of an attorney at law.

Rule No 15, § 13, of the Supreme Court Rules for the State Bar of Michigan provides that the order of the 3 judges is "subject to review by the Supreme Court, in its discretion, upon the law and the facts." In the *Emmons Case,* 316 Mich 674, we did not decide the scope of the review under these rules, but we did review and evaluate the testimony presented in the record.

Proceedings for disbarment as well as proceedings for reinstatement are not in the strict sense actions

at law or subject to the rules in law cases tried without the aid of a jury. A judgment of disbarment is conclusive evidence of a person's unfitness to practice law and the person disbarred has the burden on a subsequent petition for admission to overcome by evidence the judgment of disbarment and show that he is a proper person to be intrusted to the practice of law. In my opinion, the Supreme Court has a duty to review petitioner's application for reinstatement in the light of his previous record as an attorney as well as his conduct since disbarment in order to determine whether or not there has been rehabilitation. Nowhere in the record can there be found any evidence that petitioner acknowledges the justness of his disbarment or has made complete restitution of funds belonging to the "Endowment." His actions which brought about disbarment exhibit a total disregard of his obligations as an attorney as well as a lack of moral responsibility which must be possessed by attorneys. His restoration to the practice of law would lower confidence in the profession and be against public interest.

The order denying the petition for rehearing should be affirmed. No costs.